**Vicki WHEELER, Appellant,**

v.

**Louis W. SULLIVAN, M.D.,\* Secretary, Department of Health and Human Services, Appellee.**

No. 88–2580.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 23, 1989.

Decided Nov. 2, 1989.

Alan Nussbaum, Little Rock, Ark., for appellant.

Bill Adair, Asst. U.S. Atty., Little Rock, Ark., for appellee.

Before ARNOLD, BOWMAN and MAGILL, Circuit Judges.

---

\* Louis W. Sullivan, M.D., succeeded Otis R. Bowen, M.D., as Secretary of Health and Human Services on March 1, 1989, and therefore is substituted as defendant in this suit.

**1234**

BOWMAN, Circuit Judge.

Vicki Wheeler appeals from an order of the District Court[1] affirming a decision of the Secretary of Health and Human Services (Secretary) denying Wheeler's application for disability and supplemental security income benefits under the Social Security Act. 877 F.2d 652 (8th Cir.1989). For reversal, Wheeler argues that the Secretary's decision that Wheeler does not suffer from a disabling mental impairment was not supported by substantial evidence. We reverse and remand.

## I.

Wheeler filed her application for disability benefits in August 1984, alleging that she was unable to work as of October 1983 due to blindness and mental impairments. (Tr. 74–77). The Social Security Administration denied her application initially and on reconsideration. A hearing was held before an Administrative Law Judge in February 1987, at which Wheeler appeared with an attorney.

At the time of the hearing, Wheeler was twenty-eight years old and had the equivalent of a high school education. Her past work experience included employment as a housekeeper in a nursing home, a waitress, a furniture finisher, and a spray-gun operator in a factory. Wheeler testified that she was unable to work as of October 1983 because of mental problems, vision trouble, and blackouts. (Tr. 45–47). One psychological report, however, indicates that Wheeler had quit her job as a housekeeper in a nursing home in late 1983 because she did not like her supervisor. (Tr. 188). Wheeler has not been employed since that time.

Wheeler testified that she suffers from blackouts lasting from a few seconds to a few days and that they leave her exhaust-ed. (Tr. 45–47). Doctors prescribed Cogentin and Stelazine[2] for Wheeler's blackouts and mental problems, and Wheeler testified that the medication made her vision blurry. (Tr. 46, 49). Wheeler had quit taking medication at the time of the hearing because of her pregnancy. (Tr. 46). Wheeler also testified that her father sexually abused her as a child. (Tr. 44).

Wheeler's daily activities include light housework and watching her four-year old son. Her mother-in-law comes every day to help take care of the boy and the mother-in-law mops and vacuums and does most of the heavy cleaning. (Tr. 48). Wheeler does not drive (Tr. 45), or socialize as much as she used to. (Tr. 50). Her husband helps her shop, but Wheeler can fix meals alone and take care of her personal hygiene.

When questioned about her past use of illicit drugs, Wheeler responded that she discontinued taking such drugs five years ago. (Tr. 53). Faced with medical reports indicating that she smoked marijuana as recently as 1985 (Tr. 54–55), Wheeler denied using anything stronger than marijuana in six years and denied using marijuana in the last year and a half. (Tr. 61–62).

Mr. Wheeler testified that his wife frequently suffers from blackouts that exhaust her. (Tr. 63–64). He also testified that his wife had not smoked marijuana in a long time. (Tr. 64). Wheeler's mother-in-law testified that she had witnessed some of Wheeler's blackouts, and that Wheeler was very nervous. (Tr. 67).

The medical evidence shows that in March 1984, Wheeler was treated in the emergency room of Saline Memorial Hospital for hyperventilation. (Tr. 181–82). Wheeler was referred to the Saline Counseling and Guidance Center (the Clinic)

---

1. The Honorable H. David Young, United States Magistrate for the Eastern District of Arkansas. Pursuant to 28 U.S.C. § 636(c)(1) (1982), the parties consented to disposition of this case by a magistrate.

2. Cogentin is a strong medication used to treat parkinsonism and can be used to treat mental disorders. The drug may impair mental or physical abilities required to perform hazardous tasks, like operating machinery or driving a motor vehicle. Physicians' Desk Reference 1253 (41st ed. 1987). Stelazine is effective for the short term treatment of generalized nonpsychotic anxiety. The side effects include drowsiness and muscular weakness. Stelazine may also impair mental and physical abilities. *Id.* at 1925–26.

where her diagnosis was atypical psychosis and histrionic personality disorder.[3] (Tr. 186–88).

A Minnesota Multiphasic Personality Inventory (MMPI) conducted in March 1984 showed a generalized disturbance characterized by a negative self-image. The report submitted by Dr. Patrick Caffey, a psychologist, described Wheeler as an "acutely disturbed individual." (Tr. 185). Wheeler began therapy but was later discharged from the Clinic for failure to keep follow-up appointments. (Tr. 184).

Wheeler was hospitalized voluntarily in the Arkansas State Hospital for psychiatric care on March 20, 1984. (Tr. 226). One week prior to admission, Wheeler accused her father and brother of raping her as a child, and claimed that a member of REO Speedwagon (a rock group) was the father of her child. Wheeler also claimed not to have remembered anything prior to age fourteen (Tr. 226) and to have multiple personalities. (Tr. 228–29).

The examining psychiatrist, Dr. Wrenda Gallien, described Wheeler as well-read, having read books such as *Sybil, The Three Faces of Eve,* and books about the incubus[4] and witchcraft. (Tr. 227). Dr. Gallien described Wheeler's make-up as "peculiar" and "mask-like." (Tr. 227). Dr. Gallien also opined that Wheeler might be volunteering information to suggest that she was mentally ill, and noted that Wheeler manipulated others. (Tr. 229).

Psychological testing on March 22–23, 1984, revealed that Wheeler's intellectual functioning was within the average range. This testing indicated that the MMPI profile was not valid as Wheeler "endorsed most test items in a pathological direction," and the Rorschach protocol indicated se-

vere emotional pathology.[5] (Tr. 218). After being advised to pursue psychotherapy, Wheeler was discharged from the hospital on April 10, 1984. (Tr. 215).

Wheeler received new contact lenses in March 1984 from her optometrist, Dr. Dean McCormack. Her retractive error was high myopia and her corrective vision was 20/20. Dr. McCormack reported that Wheeler could see clearly with the proper prescription. (Tr. 193).

Wheeler was admitted a second time to the Arkansas State Hospital on May 10, 1984, at her family's request. Her family reported that she was smiling inappropriately, appeared to hear voices, and continued to claim that a member of REO Speedwagon was the father of her son. Dr. Gallien noted that Wheeler's conversation was logical and coherent, but affect was inappropriate with unnecessary laughter and strained facial expressions. Wheeler began taking Stelazine, but left the hospital against medical advice two days after admission. (Tr. 213).

In October 1984, Wheeler saw Dr. H.B. Hawley for a psychiatric evaluation. Wheeler described her blackouts and multiple personalities, and reported a fairly active social life. Wheeler stated that she "relates well with others." (Tr. 194). Dr. Hawley reported that Wheeler was in contact with reality and had no unusual motor activity. Her speech was spontaneous with no pressure or slowing. There were no illogical, odd, or vague expressions and there were no hallucinations, delusions, thoughts of persecution, obsessions, feelings of worthlessness, or somatic complaints. She was neither depressed nor elated and her thought content was appropriate to affect. Dr. Hawley further noted

---

**3.** The American Psychiatric Association describes personality disorders, as distinguished from personality traits, as "[causing] either significant functional impairment or subjective distress." Diagnostic and Statistical Manual of Mental Disorders 335 (3d ed. 1987). The essential feature of a histrionic personality disorder is "a pervasive pattern of excessive emotionality and attention-seeking." *Id.* at 348.

**4.** An evil spirit that has sexual intercourse with women while they are sleeping. Webster's

Third New International Dictionary 1146 (1981).

**5.** The Rorschach protocol was also technically invalid as the required responses had not been completed. The examiner reported, however, that Wheeler's protocol "was so filled with deviant verbalization, autistic logic, * * * that there can be little doubt as to the existence of serious emotional symptomatology." (Tr. 218).

that Wheeler's immediate, recent, and past memory were intact, and her general fund of information was intact, as was judgment. (Tr. 195). Wheeler related in a somewhat immature manner, however, seeming unconcerned about herself. Her neurological examination was normal, and Dr. Hawley diagnosed an atypical personality disorder with histrionic features. (Tr. 196).

Wheeler was rehospitalized at the Arkansas State Hospital in March 1985, with complaints of blackouts, amnesia, and fear of hurting her child during such episodes. (Tr. 200). A hospital report submitted by Dr. Gerald Fowler showed that Wheeler had a history of multiple substance abuse and that she continued to use some marijuana. (Tr. 201).

While hospitalized, Wheeler was examined by Dr. John Anderson, a psychologist, who noted that Wheeler's discourse and behavior were "replete with contradictions." For example, Wheeler stated that she had no memories of her childhood before age fourteen, yet apparently remembered earlier instances of abuse. She also stated she had vague memories of being sexually abused by "a brother five years older than her" but then stated she could not remember which brother abused her. In addition, Wheeler stated that she first came to believe she was a "split personality" when at the suggestion of a hospital physician she read the book *Sybil*, but later indicated having read the book *before* her initial hospitalization. When Dr. Anderson became curious about the similarity between the symptoms Wheeler described to those depicted in *Sybil* and *The Three Faces of Eve*, Wheeler became notably agitated and her voice quivered as she spoke. (Tr. 202).

Personality testing revealed a profile of a person who is persistently attention-seeking, interpersonally demanding, and prone to dramatic and superficial emotional displays. Dr. Anderson also reported that Wheeler was likely to possess an expansive imagination. Dr. Anderson concluded his report by describing Wheeler as an egotistic woman who tended to "avoid responsibility for her feelings and behavior." He opined that her complaints of amnesia, blackouts, and multiple personalities were "largely superficial in nature." (Tr. 203).

Wheeler returned to the Saline Counseling and Guidance Center in April 1985, and her counselor, Brenda Pike, reported that Wheeler was more cooperative and appeared to be getting along better with her husband. (Tr. 246). Dr. James H. Hickman saw Wheeler again in May 1985. He placed her back on medication (Stelazine and Cogentin) for recurrence of her mental problems. (Tr. 245).

In October 1985, Wheeler was doing well and had no depression or anxiety. (Tr. 242). She was seen in January 1986 for a medication check and was doing well with no notable side effects. As of April 22, 1986, Wheeler had no complaints except some blurring of vision and drying of the mouth. Wheeler was having no psychotic symptoms, and her Cogentin dosage was therefore reduced. (Tr. 241).

In July 1986, she was having less trouble with drying of the mouth and blurring of vision since the Cogentin was reduced. Her dosage of Stelazine was also reduced at this time, and the examining doctor reported that she had no complaints and was doing well. (Tr. 240).

Dr. J. Mayne Parker, an ophthalmologist, examined Wheeler in May 1986. He noted that Wheeler wore hard contact-type lenses for myopia, and that she reported that her vision was blurry due to her medication. Her vision with correction was 20/100 bilaterally. The external exam, visual fields, and ocular pressure were not remarkable. Dr. Parker stated that he could not find any physical findings to explain the decreased vision, and he diagnosed myopia. (Tr. 230).

Wheeler also saw Dr. Philip Mizell for a psychiatric evaluation in May 1986, where she reported that her primary problems were blackouts and lapses of memory. She also reported blurred vision, which she said was secondary to medication. (Tr. 233). Examination showed that reality contact was intact, but Wheeler appeared moderately anxious and eye contact was fleeting.

Her speech was nonspontaneous but coherent, and she did not report any symptoms resembling auditory or visual hallucinations. Wheeler described her mood as saying that she did not feel as well as she should. She was oriented as to time, place and person. Her memory was intact and general fund of information was good. (Tr. 235–237).

Dr. Mizell opined that Wheeler was experiencing dissociative episodes in a rather histrionic personality and that her episodes revealed some psychotic thinking, although she did not exhibit any psychotic symptomatology. Dr. Mizell diagnosed atypical dissociative disorder and mixed personality disorder with histrionic narcissistic traits. (Tr. 238).

At the request of her attorney, in October 1986 Wheeler saw Harold D. Love, a vocational expert, for an evaluation. On the Wechsler Adult Intelligence Scale, Wheeler had an IQ of 85, which placed her in the dull-normal range of intelligence. (Tr. 247). Mr. Love concluded that Wheeler is paranoid, depressed, has anxiety attacks and blurred vision, and "cannot even do her housework." Mr. Love opined that Wheeler is "in very bad mental health" and cannot work in the local or national economy. (Tr. 248).

The ALJ found that Wheeler had a severe mental impairment but not one that met the Listing of Impairments in Appendix 1. The ALJ discredited Wheeler's allegations of disabling mental restrictions and limitations and found that she could perform work "that was not demanding or

stressful and where there was only routine interpersonal contact." Hence, the ALJ concluded that Wheeler could perform her past relevant work as a housekeeper. (Tr. 17).

The Appeals Council denied Wheeler's request for review, making the ALJ's decision the final decision of the Secretary, and Wheeler filed suit in District Court. The District Court affirmed the ALJ's denial of benefits, finding that substantial evidence existed on the record to support the Secretary's decision. This appeal followed.

## II.

Judicial review of disability determinations is limited to determining whether there exists substantial evidence in the record as a whole to support the Secretary's decision. 42 U.S.C. § 405(g) (1982); *Bogard v. Heckler,* 763 F.2d 361, 362–63 (8th Cir.1985). In reviewing the ALJ's decision, " '[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.' " *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)).

■ As previously mentioned, the ALJ found that Wheeler has a severe mental impairment but not a listed one. In order for a claimant to meet the criteria for psychotic disorders under the Listing of Impairments, he or she must possess the characteristics set forth in section 12.03 of the regulations.[6] In determining that Wheeler

---

**6.** 12.03 *Schizophrenic, Paranoid and Other Psychotic Disorders:* Characterized by the onset of psychotic features with deterioration from a previous level of functioning.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
A. Medically documented persistence, either continuous or intermittent, of one or more of the following:
1. Delusions or hallucinations; or
2. Catatonic or other grossly disorganized behavior; or
3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:

a. Blunt affect; or
b. Flat affect; or
c. Inappropriate affect; or
4. Emotional withdrawal and/or isolation;
AND
B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from

does not have a listed impairment, the ALJ emphasized that Wheeler is not restricted in her daily activities and has only slight difficulties in social functioning. Although Wheeler testified that she did little during the day and her mother-in-law substantiated this testimony (Tr. 48, 66–67), some medical reports reflect that Wheeler performed a variety of daily activities. (Tr. 194, 235). The ALJ's resolution of these inconsistencies is entitled to deference by this court. *See Dunlap v. Harris,* 649 F.2d 637, 641 (8th Cir.1981) (resolution of conflict of evidence in social security claim based on mental illness is usually duty of trier of fact).[7] The record generally reflects that Wheeler has not had "marked difficulties in maintaining social functioning" (Tr. 194). Based on our review of the entire record, we conclude that the ALJ's determination that Wheeler did not meet the criteria for a listed impairment is supported by substantial evidence.

■■■ The appropriate test to determine whether a claimant who has a severe mental impairment but not a listed impairment is disabled by the mental impairment is " 'whether the mental impairment is of such severity that plaintiff cannot, or could not on his last eligibility date, engage in any substantial gainful employment.' " *Gavin v. Heckler,* 811 F.2d at 1198 (quoting *Dunlap v. Harris,* 649 F.2d at 638–39). Although the ALJ concluded that Wheeler could perform her past relevant work as a housekeeper, we believe that that conclusion is not supported by substantial evidence on the record as a whole. *See Gavin,* 811 F.2d at 1199. To the contrary, we conclude that Wheeler has satisfied her burden of showing an inability to return to

her past relevant work. The burden therefore shifts to the Secretary to show other jobs in the national economy that Wheeler is capable of performing. *See Parsons v. Heckler,* 739 F.2d 1334, 1339 (8th Cir.1984). Because here the ALJ terminated his analysis without requiring the Secretary to make such a showing, it is necessary that we remand this case for further administrative proceedings. Since Wheeler suffers from a severe mental impairment, the Secretary must use vocational expert testimony or other similar evidence in order to meet his burden of showing the existence of jobs in the national economy that the claimant is capable of performing. *See Gavin,* 811 F.2d at 1198 n. 3; *Parsons,* 739 F.2d at 1339. *Cf. Thompson v. Bowen,* 850 F.2d 346, 349–50 (8th Cir.1988) (where the non-exertional impairment is pain, ALJ may use Guidelines if the pain "does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines.").

We reject the Secretary's suggestion that the use of the Guidelines approved in *Thompson* is appropriate in the case of a claimant with a severe mental impairment. *Thompson* involved a claimant who allegedly suffered from disabling pain. Our decision in that case reflects the fact that a claimant with a sound mind can work despite pain (millions of people do every day), unless the pain is disabling. Objective tests of physical ability, reflected in the Guidelines, may resolve the issue of whether the claimant is disabled by reason of pain. A claimant with a severe mental impairment, however, may be incapable of holding any job, even if the claimant's body is sound and his or her physical ability unimpaired by pain or any other limiting

---

that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors); OR

C. Medically documented history of one or more episodes of acute symptoms, signs and functional limitations which at the time met the requirements in A and B of this listing, although these symptoms or signs are currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of deterioration or decompensation in situations which cause the individual to withdraw from that situation or to experience exacerbation of signs or symp-

toms (which may include deterioration of adaptive behaviors); or

2. Documented current history of two or more years of inability to function outside of a highly supportive living situation.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03 (1988).

7. Moreover, "the ALJ [does] not have to believe every detail of the claimant's version of her daily activities." *Benskin v. Bowen,* 830 F.2d 878, 883 (8th Cir.1987).

condition. As we read *Thompson*, it does not apply to claimants who, like Wheeler, have been found to have a severe mental impairment, and we distinguish *Thompson* from the present case on that basis.

## III.

The decision of the District Court is reversed and the case is remanded to the Secretary for further proceedings consistent with this opinion.